UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Chapter 7 |
|     JUDITH GOTWALD, | : | |
| | : | |
| Debtor. | : | Bky. No. 10-14759 ELF |
| | : | |
| | : | |
| SOUTHEASTERN PENNSYLVANIA | : | |
| SYNOD OF THE EVANGELICAL | : | |
| LUTHERAN CHURCH IN AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Adv. No. 11-0242 ELF |
| JUDITH GOTWALD, | : | |
| | : | |
| Defendant. | : | |
| | : | |

# O P I N I O N

## I.  INTRODUCTION

In 2007, Plaintiff Southeastern Pennsylvania Synod of the Evangelical Lutheran Church in America ("the Synod") placed the Evangelical Lutheran Church of the Redeemer of Philadelphia ("Redeemer") under "involuntary synodical administration" ("the ISA") and appointed a Board of Trustees to administer Redeemer.  Judith Gotwald ("the Debtor") was a member of Redeemer's congregation, and at relevant times, an officer of Redeemer.  Redeemer vigorously contested the Synod's authority to take control over its church and business affairs, largely on the ground that the Synod's imposition of the ISA was ultra vires.  Redeemer continued conducting business as usual despite the imposition of the ISA.

-1-

In January 2009, while litigation regarding the validity of the ISA was pending in the Pennsylvania Court of Common Pleas, Philadelphia County ("the CP Court"), Redeemer incorporated a new church entity and transferred its assets to the new entity in order to close on a $275,000.00 mortgage loan ("the Mortgage Loan") encumbering the church's real property ("the Church Property"). The proceeds of the Mortgage Loan were deposited into a bank account that the Debtor and another officer of Redeemer controlled.

On September 25, 2009, the CP Court issued an injunction ("the Injunction") that compelled Redeemer (and the Debtor) to turn over all of its assets to the Synod. Thereafter, the Synod learned of: (1) the January 2009 real estate transfer to the new church entity and the related Mortgage Loan that encumbered the real property; and (2) the existence of a bank account holding the net proceeds from the mortgage loan that was not turned over to the Synod after the issuance of the Injunction. The Synod filed a contempt petition to enforce its newly-acquired injunction. The contempt proceedings were stayed by the filing of the Debtor's bankruptcy case on June 8, 2010.

The Synod filed an adversary complaint against the Debtor in this court on March 2, 2011 asserting that its claims against the Debtor arising from the Mortgage Loan and from the Debtor's asserted violation of the Injunction are excepted from discharge pursuant to 11 U.S.C. §§523(a)(2)(A) and 523(a)(6). The Debtor contests her liability, asserting that she acted reasonably and in good faith based on the advice she received from her legal counsel.

The outcome of this dispute turns on the Debtor's state of mind at two (2) different points in time. The first is January 2009, when the Mortgage Loan took place, and the second is in the months following the entry of the Injunction on September 25, 2009.

For the reasons that follow, I have determined that:

- any debt the Debtor may owe arising from her participation in the Mortgage Loan that encumbered the Church Property is dischargeable;

- the Debtor knowingly failed to comply with the CP Court Injunction and has not established a defense based on the advice of counsel, rendering the resulting damages suffered by the Synod a debt for "willful and malicious injury" that is nondischargeable under 11 U.S.C. §523(a)(6).

Accordingly, judgment, but only in part, will be entered in favor of the Synod and against the Debtor.


## II.  PROCEDURAL HISTORY

The Debtor filed a voluntary chapter 13 bankruptcy petition on June 8, 2010.  The case was converted to a chapter 7 on November 18, 2010.  The Debtor was granted a discharge on May 23, 2011.

On March 2, 2011, the Synod filed this adversary proceeding requesting that the Debtor's debt to the Synod be held nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A).  (Doc. # 1).  The Debtor filed an Answer to the Complaint on April 4, 2011.  (Doc. #5).

After a number of continuances, trial was held on February 24, 2012 and February 27, 2012.  (Doc. #'s 42, 46).  After the close of the Synod's case in chief, the Debtor moved to dismiss the case.  The Synod moved to amend its complaint to include claims under §523(a)(6).  While not consenting to the amendment, the Debtor did not oppose permitting the Synod to go forward under §523(a)(6), conceding that she could not establish any prejudice from allowing the amendment to the Complaint.  At the close of trial, the Synod withdrew its claim under §523(a)(2)(A) in connection with the Mortgage Loan but continued to press its §523(a)(2)(A)

claim from damages stemming from the asserted violation of the Injunction.[1]

The parties submitted post trial memoranda, the last of which was filed April 23, 2012.
(Doc. #'s 54, 62).

### III.  FINDINGS OF FACT

### The Parties

1. The Synod is a non-profit corporation and a regional branch of the Evangelical Lutheran Church in America ("ELCA").

2. The Synod is responsible for, inter alia, the pastoral care and development of the ELCA mission for the congregations within its territorial limits, including Philadelphia county. (See Exhibit P-38, Synod Constitution, Bylaws, and Continuing Resolutions).

3. The Synod's ecclesiastical governance is derived from the Constitution for Synods.  (See id.).

4. The Synod Assembly is the highest legislative authority in the Synod.  (Id., S7.01).

5. At all relevant times, Reverend Claire Burkat was bishop of the Synod ("Bishop Burkat").

6. Redeemer, too, is a not-for-profit corporation.[2]

7. Prior to January 2009, Redeemer owned the real property and church building located at

---

[1]     It is unnecessary to consider the Synod's claim under 11 U.S.C. §523(a)(2) because I find the debt at issue nondischargeable under 11 U.S.C. §523(a)(6).

[2]     There is some inconsistency in the record regarding Redeemer's organizational form. However, there is no dispute that it is a non-profit entity.  It was described as a corporation by the court in Evangelical Lutheran Church of the Redeemer v. Southeastern Pa. Synod of the Evangelical Lutheran Church, 2008 Phila. Ct. Com. Pl. LEXIS 233, at *1 (Sept. 22, 2008) ("Redeemer v. Synod").  That litigation is described further in Findings of Fact Nos. 27-28, 31-32, infra.

3462 Midvale Avenue, Philadelphia, Pennsylvania (referred to previously as "the Church

Property").

8.   Redeemer was a member congregation of the Synod.  (See 1 N.T. at 35-36).[3]

9.   According to Section C6.01 of its Constitution and Bylaws, Redeemer was "an

interdependent part" of the ELCA and of the Synod, and was subject to the discipline of the

ELCA.  (Ex. P-39).

10.  Redeemer acted through its member congregation which, in turn, delegated its power and

authority to a congregation council ("Redeemer's Council").  (Id.).[4]

11.  At all relevant times, the Debtor was a member of Redeemer.  (1 N.T. at 34).

12.  At various times, the Debtor was elected as a member of Redeemer's Council and

contributed to the actions and decisions made on behalf of Redeemer.  (1 N.T. at 57-59; 2

N.T. at 88-89).

13.  The Debtor held two (2) consecutive three-year terms on Redeemer's Council which ended

in February 2008.  (1 N.T. at 58-59).  The Debtor was Vice President of Redeemer's Council

in her second term.  (Ex. P-28).

---

[3]       Trial in this proceeding occurred over the course of two (2) days, February 24, 2012 and February 27, 2012.  The Debtor testified on both days.  A partial transcript of her testimony was made. The notes of transcript from February 24, 2012 will be referred to as "1 N.T." and the notes of transcript from February 27, 2012 will be referred to as "2 N.T."


[4]       Redeemer's Constitution required congregation meetings to be called and specified corporate formalities to be followed for the actions of the congregation and Redeemer's Council to have validity.  (1 N.T. at 5; Ex. P-39, Section C5.03).

**The ISA  - June 7, 2007**

14.   S13.24 of the Synod's Constitution provided:

> if it is the opinion of the Synod Council that the membership of a congregation has
> become so scattered or so diminished in numbers as to make it impractical for such
> congregation to fulfill the purposes for which it was organized . . . the Synod Council
> .  .  .  may take charge and control of the property of the congregation to hold, manage,
> and convey the same on behalf of this synod.

(Ex. P-38).

15.   On June 7, 2007,  based upon Redeemer's fragile financial state, declining attendance

numbers, and out of a concern for Redeemer's ability to carry out its ecclesiastical mission,

the Synod Council voted to place Redeemer under the ISA and appoint a Board of Trustees

to administer the church.  (See Ex. P-24, P-25).

16.   After the ISA went into effect, the Synod Board of Trustees was assigned to meet with

Redeemer's congregation, gather information regarding the church, and make a

recommendation for further action regarding Redeemer.  (Audio Tr. at 9:42:20).[5]

17.   By letter dated October 11, 2007, Bishop Burkat invited Redeemer's congregation to meet

with the Synod on November 1, 2007 to discuss the ISA.  (Ex. P-24)

18.   Redeemer's Council only (and not the congregation) met with the Synod in November 2007

and furnished the Synod with information regarding Redeemer's membership and finances.

(See Ex. P-26).

19.   After reviewing the information provided by Redeemer, the Synod did not alter its view that

---

[5]      Reverend Raymond Miller testified on behalf of the Synod.  The notes of his testimony
were not transcribed but were digitally recorded.  Citations to the audio record will be referred to by the
time of day as follows "Audio Tr. at [time]."

Redeemer's "congregation [was] now so scattered and diminished in number and financial strength as to render it impractical for Redeemer to fulfill the purposes for which it was organized." (Ex. P-26 at 2).

20. By letters dated February 12, 2008 to Redeemer's Council and congregation, the Synod informed Redeemer that it would be closing the church and that Redeemer's Council no longer had authority to act on behalf of the congregation. (Ex. P-25; P-26).

21. After informing Redeemer's Council that it no longer had authority to conduct the business of the congregation, the Synod requested keys to the Church Building, complete bank records, and all financial and administrative documents. (Ex. P-25).

22. Bishop Burkat invited Redeemer's congregation to a congregational meeting with the Synod on February 24, 2008 to discuss the closing of Redeemer. (Ex. P-26).

23. On February 24, 2008, Bishop Burkat again attempted, but was unable, to meet with the congregation.[6]

24. Redeemer appealed the Synod's decision to place Redeemer under the ISA to the Synod Assembly, (see Ex. P-41), as was its right, (Ex. P-38, Synod Constitution S13.24).

25. The Synod Assembly heard Redeemer's appeal of the decision to impose the ISA at its

_____

[6]      The Synod claims that Redeemer's Council blocked Bishop Burkat and the Synod from meeting with Redeemer's congregation on November 1, 2007 and again on February 24, 2008, threatening to have them arrested if they did not leave the premises. The Debtor testified that, as a member of Redeemer's Council at the time, Redeemer's Council informed the Synod well in advance of the February 24, 2008 meeting that the congregation would not be meeting with the Synod and Redeemer's Council requested to meet with the Synod first. (N.T. 1 at 9-10). The Debtor intimated that under Redeemer's constitution, the Synod's Bishop did not have authority to call a congregational meeting and the appropriate measures to interact with the congregation entailed working with Redeemer's leadership. (Id. at 10). Because it is not material to the issue of nondischargeability, I make no findings on the issue.

annual meeting on May 8 and 9, 2009.  (Audio Tr. at 9:49:19).

26.   The Synod Assembly voted to uphold the Synod Council's decision to impose the ISA

against Redeemer.  (Id. at 10:07:10).


**Redeemer Files Suit  – February 28, 2008**

27.   Meanwhile, on February 28, 2008, while its ecclesiastic appeal of the imposition of the ISA

was pending, Redeemer filed a complaint against the Synod in the CP Court, asserting

claims for breach of contract relating to control of the church assets and control of the

congregation, and requesting the entry of a preliminary and permanent injunction.  See

Redeemer v. Synod, 2008 Phila. Ct. Com. Pl. LEXIS 233, at *3; see also 1 N.T. at 30.

28.   The Synod filed preliminary objections to the CP Court complaint, asserting lack of subject

matter jurisdiction, lack of capacity to sue, failure to conform to the rules of court, and legal

insufficiency.


**The Synod Responds:  Injunction Litigation Commences – June 9, 2008**

29.   On June 9, 2008, the Synod filed a complaint in the CP Court against Redeemer, the Debtor,

and Stanley Meena, Redeemer's President ("Meena"), seeking a declaratory judgment and

injunction regarding the Synod's authority to impose and enforce the ISA in an action titled

Southeastern Pa. Synod of the Evangelical Lutheran Church v. Meena, et al., No. 1343, June

Term 2009 (C.P. Phila.) (the "Injunction Litigation").  (Ex. P-42).

30.   In the Injunction Litigation, the parties filed cross motions for summary judgment.

-8-

### Dismissal of Redeemer's Affirmative Suit  - September 28, 2008

31. On September 28, 2008, the CP Court dismissed Redeemer's affirmative lawsuit against the Synod for lack of subject matter jurisdiction.  Redeemer v. Synod, 2008 Phila. Ct. Com. Pl. LEXIS 233, at *7-8.

32.  Because the dispute centered on the Synod's decision to close Redeemer's existing congregation, and based upon what it termed the "deference rule," in which courts seek to avoid interfering with the free exercise of religion by resolving only those "non-doctrinal" disputes that can be adjudicated through the application of "neutral principals of law," the CP Court concluded that it lacked subject matter jurisdiction to grant Redeemer the relief it requested.  Id. at *4-5, 7-8.

### The Epic Mortgage Loan  – January 2008 to January 2009

33. On February 24, 2008, after the imposition of the ISA but before the initiation of any civil litigation between the parties, the Redeemer congregation and Redeemer's Council met for its annual meeting.

34. During the annual meeting, the congregation elected a new council and approved Redeemer's ministry plan, which included a budget and a proposed borrowing plan.  (See Ex. P-21, P-22; 1 N.T. at 14).[7]

---

[7]     The Synod suggests that Redeemer failed to follow corporate formalities in entering into the mortgage transaction and, from that asserted failure, would like me to infer a wilful and malicious intent under §523(a)(6).  Specifically, the Synod placed at issue: whether members of the congregation were eligible to be counted for purposes of constituting a quorum at the February 24, 2008 annual meeting; whether there was a quorum; whether a motion to authorize Redeemer to mortgage the Church Property and borrow money was made and passed at the annual meeting; and, whether Redeemer

(continued...)

35. Redeemer's congregation also approved Redeemer's ministry plan.  (<u>See</u> Ex. P-21, P-22).

36. In December 2008, Redeemer's congregation passed a resolution authorizing Redeemer's

    Council to enter into a loan transaction secured by the Church Building.  (<u>See</u> Ex. P-11, P-

    12).

37. The Debtor agreed to personally guaranty the loan to Redeemer,[8] as did Freda Gowling,

    Redeemer's Secretary ("Gowling").  (1 N.T. at 22, 26).

38. In connection with her role as surety, in the spring of 2008, the Debtor provided personal

    financial information that the mortgage lender, Epic Mortgage & Funding, LLC ("Epic"),

    used to prepare a uniform residential loan application ("the Loan Application").  (2 N.T. at

    33-34; Ex. P-8).

39. The Debtor did not inform Epic that Redeemer was indemnifying the Debtor and Gowling.

    (1 N.T. at 23).

---

[7](...continued)
borrowed more funds than authorized.

       In response, the Debtor testified that after subtracting associate and children members
who were not eligible to vote, enough members of the congregation were present to constitute a quorum
at the annual meeting.  (1 N.T. at 11-13).  Additionally, the Debtor explained that the ministry plan
clearly included the budget and the plan to borrow money to fund Redeemer's current and long-term
financing needs, making it unnecessary for the congregation to approve a  separate motion authorizing
the Mortgage Loan.  (1 N.T. at 14).

       I find the connection too attenuated and decline to draw such an inference from the
asserted corporate formality shortfall.  Thus, it is unnecessary to decide whether Redeemer followed
corporate formalities at the February 24, 2008 annual meeting.  I will discuss the other bases for the
scienter finding the Synod asks me to make in Part IV.B., <u>infra</u>.

[8]     Previously, on February 24, 2008, Redeemer's congregation adopted a resolution
indemnifying the Debtor for the loan guarantee.  (Ex. P-27; 1 N.T. at 23).

40. As a condition of granting the loan secured by a mortgage on the Church Building, Epic

    required documentary evidence of Redeemer's corporate status, specifically a copy of its

    articles of incorporation.  (1 N.T. at 53-54).

41. Redeemer's officers were unable to locate its original articles of incorporation, which dated

    back to 1891.  (Id.).

42. To meet the Epic loan condition referred to in Finding of Fact No. 40, a new entity was

    incorporated on January 14, 2009, called the Evangelical Lutheran Church of the Redeemer

    of East Falls, Philadelphia ("New Redeemer").  (Ex. P-9).

43. The Debtor became the Assistant Treasurer of New Redeemer's Council in early 2009.  (1

    N.T. at 34-35; 2 N.T. at 88).

44. On January 28, 2009, Redeemer transferred the Church Property to New Redeemer by

    special warranty deed.  (Ex. P-1; 1 N.T. at 38).

45. Also on January 28, 2009, New Redeemer closed the Epic mortgage loan.  (Ex. P-1; 1 N.T.

    at 38).

46. New Redeemer's President, Meena, and legal counsel attended the closing, as did, the

    Debtor and Gowling.  (1 N.T. at 38).

47. At the loan closing on January 28, 2009, the Debtor initialed and signed each page of the

    Loan Application.  (1 N.T. at 31).

48. The Debtor did not review the application in detail for accuracy before initialing and signing

    the Loan Application, but instead believed that New Redeemer's lawyer had reviewed it and

determined that it was ready for her signature.  (1 N.T. at 27-28).[9]

49.   The Debtor did not inform the Synod that Redeemer transferred the Church Property to New

Redeemer or that New Redeemer had taken out a $275,000.00 mortgage loan against the real

property.  (1 N.T. at 42-43).[10]

---

[9]      The Synod vigorously contests this Finding of Fact.  The factual dispute arose because the Loan Application inquired whether the Debtor was involved in any litigation.  The box was checked "no," even though at the time she signed the document on January 28, 2009, the date of closing, the Debtor (and Redeemer) were involved in the Injunction Litigation, which included a dispute regarding the Church Property that served as security for the loan.

The Synod argued that the Debtor misrepresented to Epic on the Loan Application that she was not currently involved in any legal proceedings because the Injunction Litigation was already pending.  Presumably, the Synod is suggesting that this alleged purposeful misrepresentation to Epic tends to establish the Debtor's "willful and malicious" scienter for purposes of 11 U.S.C. §523(a)(6).

The Debtor maintained that: (a) the information (i.e., that she was not involved in any litigation) was accurate when she initially provided the information to Epic in the spring of 2008, several months before the commencement of the Injunction Litigation and many months before the closing; (b) when she went to the loan closing, she believed that all of the documents had been reviewed by the lawyer and were ready for her to sign; and (c) she did not verify the accuracy of the answers because she relied on the lawyer's review of the documents.  (1 N.T. at 29-30, 31; 2 N.T. at 26).

It is not obvious to me how an alleged misrepresentation designed to convince Epic to make a loan demonstrates a willful and malicious intent to injure the Synod.  In any event, I need not analyze the asserted connection further because I find the Debtor's testimony on this subject credible and I discern no intent to mislead as result of the failure to disclose the existence of the Injunction Litigation on the Loan Application.  Therefore, the inaccuracy in the Loan Application is not particularly significant in determining whether a nondischargeable debt arose as a result of the Debtor's participation in the Mortgage Loan.

[10]     The Debtor testified that she was not a member of Redeemer's Council at the time of the property transfer and it was not her responsibility to do so.  (1 N.T. at 42-43).  Putting aside the question whether she had a legal obligation to inform the Synod of the transaction, the Debtor's suggestion that she was not a principal player responsible for the conduct of Redeemer and New Redeemer is disingenuous.  At some point around the time of Redeemer's reincorporation, the Debtor became the Assistant Treasurer of New Redeemer.  (1 N.T. at 58).  As of January 28, 2009, the Debtor was present at the loan closing and signed the loan documents on behalf of New Redeemer, as the Assistant Treasurer.  (See Ex. P-30; 1 N.T. at 38).  Further, the Debtor signed as a personal guarantor on New Redeemer's mortgage loan and also signed the Loan Application in connection with the loan transaction.

50. Shortly after the closing, the Debtor and Gowling opened a bank account at Citizens Bank

("the Citizens Bank Account") to deposit the New Redeemer loan proceeds of slightly under

$190,000.00.  (1 N.T. at 42; 2 N.T. at 100-01; Ex. P-33).


**The Synod Prevails in the Injunction Litigation  – September 25, 2009**

51. On September 25, 2009, the CP Court granted the Synod's motion for summary judgment in

the Injunction Litigation and issued the Injunction, directing the Debtor to "deliver to the

Synod Trustees all keys to the Redeemer buildings, and all of Redeemer's books, records

**and financial assets**."  (Ex. P-46, at ¶1) (emphasis added).

52. The Injunction further directed the Debtor to:

> refrain from interfering with the Synod's access to the premises or its possession,
> custody or control; from representing or holding out [herself] as officer[], agent[]
> or council member[] of Redeemer; and **from maintaining possession, custody
> or control, over** any of the personal property of Redeemer, including any of its
> books and records and **any money or its equivalent, wherever held by, for on
> behalf of Redeemer.**

(Id. ¶3) (emphasis added).

53. The Debtor was present in the CP Court when the court announced its decision on

September 25, 2009 and was aware of its entry.  (2 N.T. at 41; 1 N.T. at 56).

54. On October 8, 2009, Redeemer and the Debtor filed a notice of appeal of the Injunction to

the Pennsylvania Superior Court.  (Ex. D-4).

55. On October 19, 2009, Redeemer and the Debtor filed a motion to stay the Injunction.  (Ex.

D-6).

56. The Debtor acknowledged that she understood that she was subject to the Injunction and that

-13-

she was required to comply with the order despite her attempts to stay the order during the pendency of the appeal.  (1 N.T. at 45-46, 65).

57.  On November 4, 2009, the CP Court denied the request for a stay of the Injunction pending appeal.  (2 N.T. at 19-21).

### The Debtor's Actions Just Prior to and After the Issuance of the Injunction

58.  Just prior to September 2009, the Debtor changed New Redeemer's mailing address on the Citizens Bank Account from the Church Property address in Philadelphia to a post office box in Blue Bell, Pennsylvania.  She did so in order to keep control of the money in the account.  (1 N.T. at 47-48; 2 N.T. at 62; Ex. P-33).[11]

59.  The Debtor was concerned that the Synod was going to attach the Citizens Bank Account and that Redeemer (Old or New) would not have the necessary funds to pay legal counsel and continue the effort regain control of the church assets.  (2 N.T. at 105-06, 108).

60.  After the issuance of the Injunction, the Debtor attempted to comply with the Injunction, at least in part, by turning over Redeemer's records.  She copied files from her personal

---

[11]      The Debtor testified:

A:  I changed it because it was our money and our obligation to deal with it.

Q:  And you didn't want the Synod to find out about it?

A:  I didn't particularly want the Synod to find out about it, that's true.

(1 N.T. at 48).

It appears from the bank statement that the change of address occurred a few weeks before the issuance of the Injunction.

computer to a computer disk and placed the disk and a box of other files on the church steps at a designated time.  (2 N.T. at 43-45).

61.   However, the Debtor did not relinquish control over the Citizens Bank Account.  Rather, she retained possession of the checks and continued writing checks on the account.  (2 N.T. at 85-88).

62.   The Debtor understood that the Injunction encompassed the Citizens Bank Account, notwithstanding the fact that the Citizens Bank Account was titled in the name of New Redeemer.[12]

### The Synod's Contempt Petition  – October 5, 2009

63.   On October 5, 2009, the Synod filed in the CP Court, a Petition for Contempt against Redeemer, the Debtor, and Meena.  (See 2 N.T. at 22-23).

64.   Following a hearing on January 27, 2010, the CP Court ordered all of New Redeemer's bank accounts frozen.  (See Ex. D-8).

65.   A hearing on the contempt petition was scheduled on June 9, 2010, but was stayed by the filing of the Debtor's bankruptcy petition on June 8, 2010.

---

[12]        This finding is critical to the case.  In making it, I reject the Debtor's contrary testimony. The Debtor testified that, based upon the advice of counsel, she did not believe that the Citizens Bank Account was subject to the Injunction because the account belonged to New Redeemer, which was not subject to the Injunction.  (1 N.T. at 47, 56; 2 N.T. at 87, 103-04, 107-08).  This issue is analyzed in Part IV.C.2, infra.

### Redeemer's Appeal of the Order Issuing the Injunction

66.  Redeemer and the Debtor appealed the CP Court's September 29, 2009 order (i.e., the

issuance of the Injunction) and the appeal ultimately was lodged in the Pennsylvania

Commonwealth Court.

67.  Redeemer filed an application for stay in the Commonwealth Court that was denied on

February 4, 2010.  (Ex. D-5).

68.  On April 18, 2011, the Commonwealth Court affirmed the CP court order.  Southeastern

Pennsylvania Synod of the Evangelical Church of America v. Meena, 19 A.2d 1191 (Pa.

Commwlth. Ct. 2011).[13]

69.  On November 14, 2011, the Pennsylvania Supreme Court denied Redeemer's Petition for

Allowance of Appeal.  See 32 A.3d 1279 (2011) (Table).

### The Synod Quiet Title Action  – October 9, 2009

70.  On October 9, 2009, the Synod filed a quiet title action in the CP Court against the Debtor,

---

[13]       In the appeal, Redeemer argued that the Injunction should not have been issued to
enforce the ISA because the Synod lacked authority to impose it in the first place under the Synod's
articles of incorporation.  See Redeemer Appellate Brief, 2010 WL 8322710, at *10 (Pa. Cmwlth. Ct.
Sept. 13, 2010).

        The majority of the seven (7) judge panel held that Redeemer's challenge to the
propriety of the ISA involved ecclesiastical matters regarding internal church governance that was
beyond the purview of the civil courts.  Without explaining whether it was issuing dictum or an
alternative holding, the majority also examined the relevant provisions in the Synod's organic documents
and found no conflict between the Synod's articles of incorporation and its by-laws.

        Two (2) judges dissented.  Without reaching the merits of Redeemer's ultra vires
argument, the dissenting judges opined that the ultra vires issue was a corporate law issue, not an
ecclesiastical matter.  The dissenters would have remanded the case to the CP Court for plenary
consideration of the ultra vires issue Redeemer had raised as a defense.

New Redeemer, and Meena, to obtain a determination that the Synod held title to the Church

Building.  (Ex. P-43).

71. On February 23, 2010, New Redeemer executed a deed transferring the Church Property to

the Synod.  (Ex. P-45).


### The Epic Quiet Title Action  – June 29, 2010

72. On June 29, 2010, Epic filed a complaint in quiet title in the CP Court against the Synod,

requesting a determination that Epic holds a valid, first-lien position on the Church

Building.  (Ex. P-44).

73. The Debtor, Gowling, and New Redeemer intervened in the Epic quiet title action and filed

a third-party complaint against the Synod seeking to hold the Synod liable for the mortgage

loan.  (Ex. D-8; Jt. Pretrial St. at 3).

74. At the time of trial of this adversary proceeding, the Epic quiet title action remained pending

in the CP Court.


### The Debtor's Legal Representation

75. At all relevant times, J. Stephen Woodside, Esq. ("Woodside") served as the attorney for

Redeemer, New Redeemer and the Debtor.

76. After the issuance of the Injunction, Woodside told the Debtor that the Citizens Bank

Account belonged to New Redeemer and that New Redeemer was not subject to the

Injunction.

77. The Debtor, however, did not actually rely on the advice Woodside gave her.[14]


## IV.  DISCUSSION

### A.  Dischargeability under 11 U.S.C. §523

It is well established that one of the Bankruptcy Code's key functions is to permit honest

debtors to reorder their financial affairs and obtain a "fresh start," unburdened by the weight of

preexisting debt.  See In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995); In re Marques, 358 B.R.

188, 193 (Bankr. E.D. Pa. 2006).  Exceptions to the discharge of debts are construed strictly

against creditors and liberally in favor of debtors.  E.g., Cohn, 54 F.3d at 1113; In re Glunk, 455

B.R. 399, 415 (Bankr. E.D. Pa. 2011).

The burden of proof in nondischargeability proceedings is on the objecting creditor.

Cohn, 54 F.3d at 1113; In re Stamou, 2009 WL 1025161, *3 (Bankr. D.N.J. Mar. 19, 2009); In re

Marcet, 352 B.R. 462, 468 (Bankr. N.D. Ill. 2006).  The elements under §523(a) must be

established by a preponderance of the evidence.  See Grogan, 498 U.S. at 291; In re August, 448

B.R. 331, 357 (Bankr. E.D. Pa. 2011) (citations omitted).

Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury by

the debtor to another entity or to the property of another entity."  11 U.S.C. §523(a)(6).  "Willful"

and "malicious" are distinct elements.  See In re Coley, 433 B.R. 476, 497 (Bankr. E.D. Pa.

2010); see also In re DiGiovanni, 446 B.R. 709, 716 n.8 (Bankr. E.D. Pa. 2011) (discussing

---

[14]     This, too, is a critical Finding of Fact and it is discussed further in Part IV.C., infra.

analytic difficulties in construing term "willful and malicious" under existing case law), aff'd

2011 WL 4359990 (E.D. Pa. Sept. 16, 2011).  Cf. In re Williams, 337 F.3d 504, 509 (5th Cir.

2003) (condensing "willful and malicious" into a single inquiry).

　　　　The term "willful" refers to a deliberate or intentional injury, not just a deliberate or

intentional act that leads to injury.  E.g., Coley, 433 B.R. at 497 (citing Kawaauhau v. Geiger,

523 U.S. 57 (1998)).  The plaintiff must establish that the debtor "purposefully inflict[ed] the

injury or act[ed] in such a manner that he is substantially certain that injury will result."  In re

Singer, 2010 WL 3732944, at *5 (D.N.J. Sept. 17, 2010) (citing In re Conte, 33 F.3d 303, 305

(3d Cir. 1994)).

　　　　In Conte, the Third Circuit did not expressly resolve an important issue: whether the

"substantial certainty of producing injury" standard is measured objectively (i.e., whether there

was an objective, substantial certainty of the injury resulting as a consequence of the debtor's

deliberate action, that would have been known by a reasonable person) or whether it is measured

subjectively (i.e., the debtor was aware that the injury was a substantially certain consequence of

the deliberate conduct).  See In re Connor, 302 B.R. 509, 514 (Bankr. W.D. Pa. 2003) (dictum).

　　　　Most of the courts in this Circuit that have considered the issue have held that Conte

mandates application of the subjective standard.  See In re Adalian, 2012 WL 5384094, at *4

(Bankr. M.D. Pa. Nov. 5, 2012); In re Glenn, 470 B.R. 731, 736 (Bankr. M.D. Pa. 2012); In re

Benun, 386 B.R. 59, 77 (Bankr. D.N.J. 2008); see also August, 448 B.R. at 358 (quoting In re Su,

290 F.3d 1140, 1144 (9th Cir. 2002)) (§523(a)(6) renders a debt nondischargeable "when there is

either a subjective intent to harm, or a subjective belief that harm was substantially certain").

But see In re Reath, 368 B.R. 415, 426 (Bankr. D.N.J. 2006) (dictum); In re Conner, 302 B.R.

509, 515 n.4 (Bankr. W.D. Pa. 2003) (dictum).[15]

"Malice" refers to actions that are wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will.  4 <u>Collier on Bankruptcy</u> ¶ 523.12 [2] (Alan N. Resnick, Henry J. Sommer eds., 16th ed. 2009).

> Malice does not mean the same thing for nondischargeability purposes under §
> 523(a)(6) as it does in contexts outside of bankruptcy. <u>In bankruptcy, debtor may
> act with malice without bearing any subjective ill will toward plaintiff creditor or
> any specific intent to injure same.</u>

<u>In re Wooten</u>, 423 B.R. 108, 130 (Bankr. E.D. Va. 2010) (citation omitted) (emphasis added); <u>see
also</u> <u>In re Vidal</u>, 2012 WL 3907847, at *28 (Bankr. E.D. Pa. Sept. 7, 2012).

### B.  <u>The Asserted Debt Arising from the Mortgage Loan is Dischargeable</u>

### 1.

The Synod's first claim is that the Debtor is liable for her participation in and facilitation of the Mortgage Loan, a transaction that resulted in a wilful and malicious injury to the Synod's property (<u>i.e.</u>, the Church Building).

---

[15]    Rather than offering an opinion one way or the other on the issue whether <u>Conte</u> requires application of a subjective or objective standard, I have determined that I will decide the issue only if it makes a difference in the outcome of the particular proceeding before me.  If, in a particular proceeding, the debt either: (a) would be nondischargeable under the more rigorous "subjective" test of §523(a)(6) nondischargeability or (b) would be dischargeable anyway under the less rigorous objective test, it is unnecessary to decide the question.

In this proceeding, I do not have to decide the issue.

As discussed in Part IV, C., I conclude that even under the more rigorous, "subjective" <u>Conte</u> standard, the Synod's claim arising from the alleged contempt of the Injunction is nondischargeable under 11 U.S.C. §523(a)(6) and that even under the less rigorous "objective" <u>Conte</u> standard, the claim arising from the Debtor's participation in the Mortgage Loan is dischargeable.

The Synod's primary contention in support of its §523(a)(6) claim arising from the Mortgage Loan is as follows: the Debtor necessarily knew that she and Redeemer had no authority to engage in the transaction after the imposition of the ISA, yet, she nonetheless proceeded to assist New Redeemer in closing on the Mortgage Loan, with the certain result of injuring the Synod's property rights.[16]

The Synod further attempts to bolster its characterization of the Debtor's scienter as willful and malicious by other, circumstantial evidence.  Specifically, the Synod asserts that the Debtor's wilfulness and maliciousness may be gleaned circumstantially from certain actions the Debtor took in connection with the Mortgage Loan transaction:

(1) the fact that the Debtor made sure that Redeemer maintained its liability insurance for the corporate officers;

(2) Redeemer's agreement to indemnify the Debtor in connection with her personal guarantee of the loan;

(3) the Debtor's inaccurate statement on the Loan Application regarding the existence of prior litigation; and

(4) Redeemer's eleventh hour transfer of the Church Property to New Redeemer just prior to consummation of the Mortgage Loan.

The Debtor responds by focusing on her state of mind at the time of the Mortgage Loan in January 2009.  At that time, she and Redeemer were involved in the as-yet undecided Injunction Litigation and the appeal to the Synod Assembly, in which she and Redeemer continued to

---

[16]     The Synod further contends that the nondischargeable wilful and malicious injury encompasses both the impairment of the Synod's equity in the Church Building and the Synod's legal costs incurred thereafter – specifically, the legal expenses for bringing and defending the quiet title actions in the CP Court.

contest what they considered to be the Synod's wrongful exercise of authority over Redeemer

and its assets.   Thus, her defense is that in January 2009, she did not know that she and Redeemer

would be unsuccessful in their efforts to negate the ISA and therefore, it was not substantially

certain that her actions would cause any injury to the Synod.[17]  She argues further that her actions

were not willful and malicious because she believed that Redeemer was authorized to transact

business and the lending transaction was approved by the congregation in accordance with

corporate procedures.   Moreover, the Debtor suggests that she had a limited role in the Mortgage

Loan as a personal guarantor on the loan.

Assuming arguendo that the Synod has a valid claim against the Debtor for her role in the

Mortgage Loan that was effected even though the Synod had previously imposed the ISA on

Redeemer,[18] the Synod bears the burden of proving that the Debtor acted willfully and

---

[17]      In this regard, the Debtor suggests that her position finds support from the fact that,
subsequently, two appellate judges (albeit in dissent) believed that the legal propriety of the ISA
warranted further proceedings in the CP Court.

[18]      If Redeemer is liable to the Synod for wrongfully entering into the Mortgage Loan,
arguably, the Debtor, too, is liable based on a "participation theory" of liability.  Under Pennsylvania
law, a corporate officer may be held liable for the tortious acts of a corporation if the officer participated
in the wrongful conduct.   See e.g., In re Balko, 382 B.R. 717, 725 (Bankr. W.D. Pa. 2008); Wicks v.
Milzoco Builders, Inc., 503 Pa. 614, 621 (Pa. 1983) (under participation theory, liability is not predicated
on finding that corporation is mere alter ego of individual corporate officer, rather liability attaches
where record establishes individual's participation in tortious activity); see also, In re Morrison, 555 F.3d
473 (5th Cir. 2009) (debtor personally liable for nondischargeable debt incurred by company he
controlled).

For a debt to be nondischargeable under 11 U.S.C. §523(a), the plaintiff must establish
two (2) elements.  The debt itself must be valid.  And, the debt must satisfy all of the requirements of one
of the subsections of §523(a).  See August, 448 B.R. at 346-47 (citing cases).

Because I conclude that the Synod has not established its claim for nondischargeability
under §523(a)(6), the debt is dischargeable and it is not necessary to decide whether the debt is valid via
the "participation theory" of liability.

maliciously in entering into the loan transaction on behalf of Redeemer.  As explained below, the Synod has failed to meet that burden.

## 2.

The Synod's primary focus – that the Debtor, as a corporate officer of Redeemer, impaired the value of the Synod's property (the Church Building) by engaging in the Mortgage Loan, knowing full well that, due to the ISA, Redeemer lacked the authority to enter into the transaction, thus causing a wilful and malicious injury to the Synod – is not implausible.  By the time of the Mortgage Loan, Redeemer's initial civil challenge to the ISA had failed, with one CP Court judge having issued an order, that was not appealed, determining that Redeemer's challenge to the ISA was not justiciable.  The theory may find further support in certain factual details such as Redeemer's transfer of the Church Property to a new entity (New Redeemer) and the subsequent use of the proceeds of the Mortgage Loan for payment of Redeemer's attorney's fees in its legal battle against the Synod.

Nevertheless, other evidence in the record convinces me that the Synod has not met its burden of proof on the wilful and malicious scienter issue under 11 U.S.C. §523(a)(6).

Prior to January 2009, Redeemer demanded that the Synod cease and desist in its attempted enforcement of the ISA.  When the Synod failed to comply, Redeemer challenged the Synod's decision:

> (1) administratively/ecclesiastically within the ELCA by filing an appeal to the Synod Assembly; and
>
> (2) by filing suit in the CP Court.

By January 2009, the civil lawsuit challenge had failed, as it was dismissed for lack of subject matter jurisdiction under the "neutral principles of law" doctrine, but Redeemer was still challenging the validity of the ISA on two (2) fronts:

(1)  Redeemer's appeal before the Synod Assembly had not been decided; and

(2)  Redeemer and the Synod  were engaged in a second round of the civil litigation (the Injunction Litigation), which was still unresolved.[19]

In fact, the CP Court did not grant the Synod the Injunction until the fall of 2009, almost eight (8) months after the Mortgage Loan.  Thus, at the time of the closing of the Mortgage Loan in late January 2009, the Injunction Litigation was active, no injunction had been issued and Redeemer still had legal theories for defeating the ISA, theories that had sufficient potential merit to support the inference that Redeemer and its principals had a reasonable basis[20] to believe that they would prevail in their litigation with the Synod, with the ultimate result being that their authority to control the church assets (and to enter into the Mortgage Loan) ultimately would be vindicated.[21]

---

[19]      The very existence of the Injunction Litigation may explain why Redeemer did not appeal the C.P. Court's September 28, 2008 order dismissing Redeemer's affirmative suit.  Whether it is a good explanation is another story.  It is puzzling that in the Injunction Litigation, the CP Court (acting through a different judge) and the Commonwealth Court permitted Redeemer to relitigate the merits of the jurisdiction issue.  I presume that the doctrine of issue preclusion was not raised in the Injunction Litigation.  If so, that is all the more reason why, in January 2009 Redeemer and the Debtor had a basis for believing that they might yet prevail in the civil litigation regarding the validity and enforceability of the ISA.

[20]      In my analysis, I am employing the "objective" Conte test, which is more favorable to the Synod.  See n.15, supra and accompanying text.

[21]      Borrowing terminology from case law involving the grant or denial of a stay pending appeal, the issues Redeemer and the Debtor continued to litigate in the Injunction Litigation were

(continued...)

-24-

In summary, the legal posture of the pending state court litigation and administrative

appeal within the Synod hierarchy in January 2009 undermines the Synod's argument.  At that

point in time, Redeemer and the Debtor were presenting non-frivolous grounds challenging the

validity of the ISA in the civil court and through the ecclesiastical appeal process.  Thus, the

Debtor had a reasonable basis to believe she was assisting Redeemer in conduct that was

legitimate and that therefore, would not harm the Synod.  Because it was not objectively,

substantially certain that the Mortgage Loan would injure the legitimate property interests of the

Synod, any liability the Debtor may have from her participation in the transaction is not excepted

from discharge under 11 U.S.C. §523(a)(6).


### 3.

Nor am I convinced that I should infer circumstantially that the Debtor acted wilfully and

maliciously within the meaning of 11 U.S.C. §523(a)(6) based on certain actions she took in

connection with the Mortgage Loan.

With respect to the first two (2) pieces of evidence presented by the Synod (i.e.,

maintenance of liability insurance for the corporate officers and Redeemer's agreement to

indemnify her on her personal guarantee of the Epic loan), the Debtor's actions were consistent

with any conventional financing transaction in which an individual guarantees the loan made to a

---

[21](...continued)
sufficiently serious, substantial, difficult or doubtful, as to make them "fair ground for litigation."  In re
Lickman, 301 B.R. 739, 743 (Bankr. M.D. Fla. 2003) (quoting In re Yellow Cab Cooperative Ass'n, 192
B.R. 555, 557 (D. Colo.1996)).  But see n.18, supra.  My conclusion on this point finds support in the
dissenting opinion of two (2) judges of the Pennsylvania Superior Court in Redeemer's appeal of the
order granting the Injunction.  See n.13, supra.

related entity.  They are neither out of the ordinary nor especially probative on the §523(a)(6)

scienter issue.

As for the inaccuracy on the Loan Application, I have resolved that factual dispute in the

Debtor's favor, finding the error to be an innocent mistake rather than a product of a wrongful

scheme to cheat the Synod (or Epic).  See Finding of Fact No. 48 & n.9, supra.[22]

The only other red flag raised by the Synod with respect to the Mortgage Loan is Old

Redeemer's eleventh hour transfer of the Church Property to New Redeemer just prior to grant of

the mortgage to Epic.  However, while I agree that the transfer is a red flag warranting further

scrutiny, I have credited the explanation that the property transfer was caused by Old Redeemer's

inability to locate its very old, initial corporate documents as requested by Epic and not by any

intent to hinder and delay the Synod.

The Synod's combined thought appears to be that the Debtor acted surreptitiously to

effectuate the Mortgage Loan, suggesting an awareness of the impropriety of her conduct and an

understanding that it would harm the Synod.  While there is some logic to this argument, I find

that all of the connections the Synod attempts to make too attenuated to support the factual

inference the Synod requests regarding the Debtor's scienter at the time of the Mortgage Loan.

---

[22]    Similarly, the Synod seeks support for its position in the Debtor's failure to advise Epic
of Redeemer's corporate resolution indemnifying her in connection with the loan transaction.  See
Finding of Fact No. 39.  However, I fail to see how either the existence of the indemnification or the
failure to notify Epic supports a finding that the Debtor knew that she was engaged in wrongful conduct
that was substantially certain to cause injury to the Synod.

**4.**

In short, after considering the totality of the circumstances as they existed in January

2009, I decline to draw the inference that the Debtor acted with a wilful and malicious intent in

facilitating the Mortgage Loan.  It follows that any claims the Synod may have against the Debtor

personally arising from her participation in the transaction, including the Synod's legal fees

incurred in the quiet title action it filed against Redeemer and in defending the Epic quiet title

action are dischargeable.  See Coen v. Zick, 458 F.2d 326, 329 (9th Cir. 1972) (section 523(a)(6)

"is measured by the nature of the act, i.e., whether it was one which caused willful and malicious

injuries . . . [a]ll liabilities resulting therefrom are non-dischargeable").

**C.  The Debt Arising from Violation of the Injunction Is Nondischargeable**

**1.**

The Synod focuses next on the Debtor's conduct following the CP Court's issuance of the

Injunction on September 25, 2009.  The Synod argues that the Debtor was aware of the

Injunction, but flagrantly disregarded the CP Court's directive to deliver all of Redeemer's

books, records and assets to the Synod.

In response, the Debtor raises two (2) arguments.  First, because the Citizens Bank

Account was titled in the name of New Redeemer and the Injunction required her to turn over

only (old) Redeemer's assets and property, she argues that she did not violate the Injunction and

could not have caused a wilful and malicious injury.  Second, even if the Citizens Bank Account

was subject to the Injunction, the Debtor contends that she lacked the scienter required under

§523(a)(6), i.e., her actions were not wilful and malicious, because she relied upon the advice of counsel.

For purposes of this §523(a)(6) adversary proceeding, I conclude that the Synod has met its burden of proving that the Citizens Bank Account was subject to the Injunction. I also find that the Debtor's knowing failure to comply with the Injunction by retaining control of the Citizens Bank Account to the Synod and continuing to expend money from the account on behalf of New Redeemer, caused a willful and malicious injury, rendering the debt arising from her conduct nondischargeable.[23]

## 2.

Initially, I am unpersuaded by the Debtor's hypertechnical argument that the Injunction did not apply to the Citizens Bank Account because the account was titled in the name of New Redeemer, not Redeemer.

The Injunction upheld the validity of the ISA, which entitled the Synod to control all of the assets of Redeemer. The ISA was established while Redeemer held title to the Church Property. The transfer of the Church Property to New Redeemer violated the ISA. The

---

[23]   The Synod was stopped short of getting an order from the CP Court by the Debtor's bankruptcy filing, one day prior to the contempt hearing.

To be clear, this court is not holding the Debtor in contempt of the Injunction. Only the CP Court can issue a contempt order for violation of its prior order. See Red Nation Partnership v. Kiga, 51 F. App'x 630, 632 (9th Cir. 2002) (nonprecedential); In re Startec Global Communications Corp., 292 B.R. 246, 253 (Bankr. D. Md. 2003); Commonwealth ex rel. Shecter v. Shecter, 95 A. 468, 469-70 (Pa. Super. Ct. 1915). However, in order to determine a debt nondischargeable, I must decide that a debt exists in the first place, see n.18, supra. Thus, I must determine whether the Synod has a valid claim against the Debtor.

placement of a mortgage lien on the Church Property as security for the Epic Mortgage Loan also

violated the ISA.  Perhaps most importantly, all of funds in the Citizens Bank Account were

derived from the Mortgage Loan and the equity in the Church Property.

 Neither New Redeemer nor the Debtor have ever suggested that the Church Property was

not subject to the Injunction, despite the fact that the property was titled in the name of New

Redeemer when the Injunction was issued.  Although there was some delay, New Redeemer

ultimately complied with the Injunction by executing a deed transferring the Church Property to

the Synod.  Having treated the Church Property as property of Redeemer that was subject to the

Injunction, though technically titled in the name of New Redeemer, I conclude there is no good

faith, colorable ground to distinguish the Citizens Bank Account, which constituted the fruit of

the Church Property's equity, from the Church Property itself.

 The only remaining question is whether the Debtor's state of mind was wilful and

malicious when she withheld the Citizens Bank Account from the Synod in the months following

the issuance of the Injunction.

### 3.

 The Debtor acknowledged at trial that she was aware that she was subject to the

Injunction and, absent a stay, she was required to comply with the Injunction order unless and

until it was overturned on appeal.  Thus, there is no question that the Debtor understood her

obligation to comply with the Injunction.

 Given the undisputed facts regarding derivation of the source of the funds in the Citizens

Bank Account, it is entirely intuitive that the Injunction would encompass not only the Church

Property (titled in the name of New Redeemer when the Injunction was issued), but also the loan proceeds derived from the mortgage loan against the property.  Based on my observation of the Debtor during the trial, I find her to be sufficiently intelligent and sophisticated to have grasped this obvious point.  Thus, to the extent that the Debtor suggests that she subjectively believed that the Citizens Bank Account was not subject to the Injunction because the account was titled in the name of New Redeemer, I do not credit that testimony.

Furthermore, not only was it entirely intuitive that the Injunction would require turnover of assets (and the proceeds of assets) transferred by Redeemer to New Redeemer, the Debtor's actions following the entry of the Injunction suggest that she was attempting to evade compliance with the court's order.

The Debtor complied with other requirements of the Injunction, for example, by making copies of Redeemer's records that were stored on her personal computer and by assisting in the process of obtaining boxes of financial records from Redeemer's book keeper.  At no point however, did the Debtor make any effort to disclose the whereabouts of the loan proceeds or the existence of the Citizens Bank Account.  Her ability to retain control of the account was facilitated by her actions in changing the mailing address on the account shortly before the Injunction issued, so that the monthly account statements would be sent to a post office box in Blue Bell, Pennsylvania, rather than to the Church Property itself.  The Debtor testified that she did this so that she could keep control of the money.  These actions are best understood as a conscious effort to evade compliance with the Injunction.

**4.**

The Debtor's last argument is that she lacked the requisite "willful and malicious"

scienter under §523(a)(6) because she was following the advice of her legal counsel in failing to

disclose or turnover control of the Citizens Bank Account.

"Advice of counsel" is not really a "defense" in a §523(a)(6) proceeding in the sense of

being an affirmative defense.  Rather, it is a species of evidence that is offered to negate the

requisite element of intent under §523(a)(6).

> In the last analysis, the issue is whether adding the alleged reliance on counsel . . .
> leaves the trier of fact unable to conclude by a preponderance of the evidence that
> the debtor acted with the requisite intent.

United Orient Bank v. Green, 215 B.R. 916, 928 (S.D.N.Y. 1997); accord In re Topper, 229 F.2d

691 (3d Cir. 1956) (in denial of discharge proceeding).[24]

The burden of production of evidence in support of the "defense" rests with the debtor.

Matter of Patterson, 70 B.R. 124 (Bankr. W.D. Mo. 1986).  However, the ultimate burden of

persuasion with respect to the elements of a nondischargeability claim under §523(a)(6) remains

with the plaintiff at all times.

Courts have described the advice of counsel defense as requiring that the debtor establish

---

[24]     One court has stated that the majority of courts have held the advice of counsel defense
is not available in nondischargeability proceedings under 11 U.S.C. §523(a)(6).  See In re Sarff, 242 B.R.
620, 629 (B.A.P. 6th Cir. 2000).  I find little support for this assertion.  Although the defense frequently is
rejected for lack of sufficient proof, my research suggests that most courts recognize the defense.
However, the case law does suggest that the debtor may be precluded from raising the defense if he or
she was held in contempt of court prior to the bankruptcy filing.  See, e.g., In re Nangle, 274 F.3d 481
(8th Cir. 2001); In re Rosenberg, 2007 WL 2156282, at *4 (Bankr. N.D. Ohio Jul. 23, 2007); In re Heyne,
277 B.R. 364, 369 (Bankr. N.D. Ohio 2002); In re Myers, 235 B.R. 838, 846 (Bankr. D. S.C. 1998); In re
Blankfort, 217 B.R. 138, 145 (Bankr. S.D.N.Y. 1998); In re Shteysel, 221 B.R. 486, 489 (Bankr. E.D.
Wis. 1998).  That situation is not presented here.

that:

> (1) all relevant facts were fully and fairly communicated to legal counsel;
>
> (2) the debtor acted upon counsel's legal advice; and
>
> (3) the reliance was reasonable in the existing circumstances.

See In re Wehri, 212 B.R. 963, 969 (Bankr. D. N.D. 1997); In re Siddell, 191 B.R. 544, 554

(Bankr. N.D.N.Y. 1996); In re Ketaner, 149 B.R. 395, 401 (Bankr. E.D. Va. 1992); In re Murray,

116 B.R. 473, 476 (Bankr. E.D. Va. 1990); see also In re Dawley, 312 B.R. 765, 787 (Bankr.

E.D. Pa. 2004) (applying this principle in objection to discharge under §727(a)).

     I find it difficult to harmonize the third prong of this test with what I have called the

"subjective" Conte standard (which I am employing in evaluating the Synod's claim that the

Debtor's conduct after the issuance of the Injunction cause willful and malicious injury). See n.15

& accompanying text, supra. If a debtor has relied on the advice of counsel and subjectively

believes that his or her conduct is permissible and will not harm the legitimate interests of the

creditor, application of the subjective Conte test should result in a determination of

dischargeability, even though reliance on the advice may not have been reasonable in an objective

sense. This principle finds support in §523(a)(6) decisions involving technical conversions of

property. See, e.g., In re Whiters, 337 B.R. 326, 345 (Bankr. N.D. Ind. 2006) ("the key in

conversion cases is to analyze each set of circumstances on a case-by-case basis to determine

whether the conversion is in the nature of an intentional tort or whether the conversion is a result

of a negligent or reckless tort-but not willful or malicious"); see also In re Hartman, 254 B.R. 669,

675 (Bankr. E.D. Pa. 2000) (due to her lack of sophistication debtor found not to be acting with

substantial certainty that breach of security agreements would result in injury to secured creditor).

Further, my research has located no cases in which the advice of counsel "defense" was rejected solely on the ground that the debtor's reliance was unreasonable.

The conclusion I draw from this analysis is that the reasonableness of the debtor's reliance on that advice is not properly part of any "test" as to the viability of an advice of counsel "defense" in §523(a)(6) proceedings under the "subjective" Conte test.  Rather, the primary elements of the "defense" are:

>     (1) did counsel give the advice;
>
>     (2) was the advice "legal" advice;
>
>     (3) did the debtor rely upon the advice of counsel;
>
>     (4) while acting in good faith.

See generally In re Adeeb, 787 F.2d 1339, 1343 (9th Cir. 1986) ("Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts. . . . However, the debtor's reliance must be in good faith.").[25]

If all of these elements are met, the scienter requirement of §523(a)(6) is negated.[26]

---

[25]     Adeeb involved an objection to discharge under 11 U.S.C. §727(a)(2)(A). That Code section, like §523(a)(6) requires the plaintiff to prove a wrongful "subjective intent."  Under §727(a)(2)(A), the necessary subjective intent is to "hinder, delay or defraud a creditor."  Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993).

[26]     In substituting consideration of the debtor's good faith in place of reasonableness of the debtor's reliance on the advice of counsel, I do not mean to suggest that a court may never consider the reasonableness of the advice.  (In fact, I will do so below).  The reasonableness of the advice may be useful in evaluating the credibility of the debtor's evidence that he or she actually relied upon the advice of counsel in taking the actions at issue in the adversary proceeding.  My point is that, the unreasonableness of the reliance on counsel's advice, by itself, is not grounds to reject a debtor's argument that he or she did not act wilfully within the meaning of §523(a)(6).

I also observe that aside from altering the conventional advice of counsel "test" in §523(a)(6) cases by substituting "good faith" for "reasonableness, I have omitted as an express element

(continued...)

-33-

With this gloss on the law as articulated in prior cases, I evaluate the Debtor's defense here.

## 5.

Here, the Debtor testified unequivocally that Woodside, who also was the attorney for Redeemer and New Redeemer, served as her lawyer, told her that: (a) the Citizens Bank Account belonged to New Redeemer, (b) New Redeemer was not subject to the Injunction and (c) she need not turn over the funds to the Synod.  (1 N.T. at 47, 56; 2 N.T. at 87; 99-104).  I find the Debtor's testimony regarding the content of her discussion with Woodside credible.[27]  I also will accept the premise that the advice was "legal advice."  However, I find the advice so unreasonable and the

---

[26](...continued)
the requirement that the debtor fully and fairly communicated all relevant facts were to the attorney. Similarly, evaluating whether the information the debtor gave counsel as the foundation for the legal advice provided was accurate and complete also may be relevant in the inquiry.  The completeness of the information provided to counsel and the reasons for any shortfall in disclosure may affect the court's findings on both reliance and good faith.  See Matsushita Electronics Corp. v. Loral Corp, 1995 WL 527640, *4 n.3 (S.D.N.Y. Sept. 7, 1995).  In my view, the quality of the debtor's disclosure to counsel is better analyzed as an aspect of elements (3) and (4) set forth in the text, rather than an independent element of the advice of counsel defense..

[27]       Woodside did not testify and therefore, neither corroborated nor disputed the Debtor's testimony regarding the legal advice she says he gave her after the issuance of the Injunction in September 2009.  Not only was that legal advice obviously wrong, but it is easy to envision how such advice might lead to litigation against Woodside's personally, especially since, as a result of his advice, he received $20,000.00 in legal fees from the bank account that should have been turned over to the Synod after the entry of the Injunction, resulting in the Synod financing litigation against itself.  (See 1 N.T. at 50, 54).  Thus, it is possible to interpret his silence following the Debtor's testimony as a corroboration of the Debtor's testimony through a tacit admission against interest.  On the other hand, because Woodside was the Debtor's trial counsel, he was not in a position to dispute the Debtor and undermine her case during the trial – at least not without seeking leave to withdraw as counsel and he made no such request.  In any event, based on my observation of the Debtor at trial, I found her testimony on this point to be credible.

quality of the evidence presented by the Debtor regarding the circumstances in which this advice

was given so insubstantial that I am not persuaded that the Debtor actually relied upon

Woodside's advice in good faith when she failed to comply with the Injunction and turn over the

Citizens Bank Account to the Synod.  Therefore, she has not negated the compelling evidence of

wilful and malicious intent produced by the Synod.

Simple common sense strongly suggests that the advice Woodside gave the Debtor was

obviously wrong.  The Debtor explained at trial that the <u>only</u> reason New Redeemer was formed

was to solve a technical problem in satisfying the conditions for the Epic Mortgage Loan.  She

agreed with the statement that "the new church was really the same as the old church." (2 N.T. at

100).  The Debtor was a leader in her church sufficiently intelligent to understand that once the

CP Court ordered all of the church assets be turned over to the Synod, this obligation

encompassed the remaining proceeds of the Mortgage Loan.  Indeed, the Debtor and New

Redeemer turned over all of the other church assets, including title to the Church Building.  The

Debtor was unable to offer any type of rationale for distinguishing how the Citizens Bank

Account differed from the other Redeemer assets.  She only said that she acted on the advice of

her counsel.  But why blindly accept that advice when all of the other assets were being turned

over?  <u>See generally</u> <u>Matsushita Electronics Corp.</u>, 1995 WL 527640, at *4 n.3 ("if the advice was

in plain disregard of the law, the client may not be able to use it as a shield").

Stated slightly differently, Woodside's advice was so unreasonable that it casts

considerable doubt whether the Debtor actually accepted it and relied upon it.  I consider it more

likely that the Debtor's conduct was a product of her dogged commitment to the cause of her

church, as she perceived it.  By retaining control of the Citizens Bank Account, she could continue

her fight to protect the Redeemer congregation from what she considered to be the Synod's

wrongful interference (including retention of control over a source of payment for Woodside legal

fees, undoubtedly a necessary element for continuing that fight).  By giving her the advice he did,

Woodside may have provided the Debtor with a kind of faux license or some psychological

comfort, but it does not convince me that she actually relied on the advice and lacked an

awareness of the harm caused to the Synod when she failed to deliver the Citizens Bank Account

to the Synod after the issuance of the Injunction and the denial of the stay pending appeal.

The other difficulty I have with the Debtor's position on this issue is that her testimony

was too terse to convince me that she truly relied on Woodside's advice.  She said little beyond

the conclusory statement she acted based on Woodside's advice.  She provided no details

regarding her interaction with Woodside that would explain why she would accept and follow his

irresponsible, self-serving advice.  For example, she did not state that Woodside specifically told

her not to turn over the Citizens Bank Account and the checks; she did not state whether he

explained the basis for his advice that the account was not subject to the Injunction; she did not

state whether she questioned his advice or blindly accepted it.  In light of the counterintuitive

nature of the advice she was given, these types of details are critical in assessing the Debtor's

behavior.  In their absence, she has not met her burden of production on the issue and I am left

unconvinced by her sparse, conclusory testimony.

All of that said, I reach the result here with some degree of reluctance.  The law often

draws fine distinctions that are imperceptible, even mysterious and counterintuitive, to a

layperson.  Many clients are sufficiently unsophisticated and malleable that they will accept and

rely on legal advice that proves to be incorrect and ill-considered.  I fully recognize that in such

cases, the advice of counsel will negate the scienter element of §523(a)(6). But based on my

assessment of the Debtor, whom I found sufficiently sophisticated to understand the meaning,

scope  and requirements of the Injunction, even without legal advice, this is not such a case.

Rather than having her willpower and natural instincts regarding right and wrong overpowered by

the presumptive authoritativeness of "legal" advice from her attorney, I consider it more likely

that the Debtor chose to act as she did without relying materially on Woodside's advice for the

reasons I have described above.


### 6.

To sum up, I find that the Debtor knew her actions in concealing the Citizens Bank

Account and dissipating the loan proceeds in the account were wrongful and substantially certain

to cause injury to the Synod.  This satisfies the scienter requirement under 11 U.S.C. §523(a)(6).


### IV.  CONCLUSION

For the reasons set for above, the Synod failed to establish that the Debtor's actions in

connection with the Mortgage Loan gave rise to a debt for a willful and malicious injury that is

nondischargeable under §523(a)(6).  However, the Synod has proven that the Debtor's conduct in

failing to comply with the Injunction and concealing and dissipating the loan proceeds in the

Citizens Bank Account gave rise to a debt for a willful and malicious injury that is

nondischargeable under §523(a)(6).


-37-

An appropriate order will be entered.


**Date:**  **March 26, 2013**


_____

**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**